**In re John Robert BURKE, Debtor.**

**Albert Hoffman, Chapter 7 Trustee, Plaintiff,**

**v.**

**Richard Greene, Joseph J. Blackman, Firstbank of Lakewood Janet Adams, in her capacity as Clerk of the District Court, Denver District Court, State of Colorado, and Las Margaritas, Inc., Defendants.**

**Richard Greene, Plaintiff,**

**v.**

**John Robert Burke, Defendant.**

**Bankruptcy No. 98–25466–MER. Adversary Nos. 98–01754– SBB, 99–01117–HRT.**

United States Bankruptcy Court, D. Colorado.

Aug. 23, 2007.

---

58. *Id.*

Eldon E. Silverman, Denver, CO, for Plaintiff.

Richard L. Shearer, J. Alan Call, Stephen T. Johnson, Neil L. Tillquist, Robert M. Dwyer, Denver, CO, Robert R. Graft, Englewood, CO, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court on the second phase of this adversary proceeding by way of John Robert Burke's ("Mr. Burke") Motion for Hearing on Objection to Claim of Richard Greene ("Mr. Greene") filed September 15, 2004 (Docket # 184) and the Objection to Claim of Richard Greene filed in the main bankruptcy case on July 9, 2004 (Docket # 214 in case 98–25466–MER).[1] In the first phase of this adversary proceeding, on September 2, 2004, this Court entered it's Findings of Fact, Conclusions of Law and Order denying Mr. Greene's claims seeking exception to discharge of his claims against Debtor pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6) (Docket # 180).[2] The September 2, 2004, Order concluded the first phase of this adversary proceeding and further ordered that either party may file a motion on or before September 15, 2004, to request a hearing on any remaining issues that must be determined in this adversary proceeding.

A trial on the Objection to Claim was conducted July 26–28, 2006, August 15, 2006 and December 8, 2006. Mr. Greene appeared and was represented by his counsel, Richard L. Shearer and J. Allan Call. Mr. Burke also appeared and was represented by his counsel, Maria Flora. After the trial, at the request of the Court, the parties submitted proposed findings of fact and conclusions of law in February of 2007. The Court, having reviewed the file, having considered the arguments of counsel, having considered the proposed findings of fact and conclusions of law submitted by counsel, and being advised in the premises, makes the following Findings of Fact, Conclusions of Law and Order.

## I. *Factual and Procedural Background*

The dispute between Mr. Burke and Mr. Greene has been protracted and complicated, with history stretching back 17 years in a business venture in Cabo San Lucas, Mexico in 1990, the Baja Cantina. The business venture resulted in litigation in Mexico, Denver District Court and the U.S. Bankruptcy Court.

To the degree and extent this Court's previous findings of fact, conclusions of law, decisions and opinions, as designated, are relevant to this ruling, the Court adopts and incorporates them herein: (a) Minutes of Proceeding and Oral Ruling on the record dated August 20, 2004 (Docket # 178),[3] (b) Findings of Fact, Conclusions of Law and Order dated September 2, 2004 (Docket # 180),[4] (c) Memorandum Opinion and Order Denying Relief Sought by Mr. Greene dated March 18, 2005

---

1. Greene's Proof of Claim for $1,394,142.00 was filed on February 12, 1999 and is designated as claim no. 7 in the main bankruptcy case, 98–25466–MER.

2. Unless noted otherwise, all docket numbers refer to the docket in adversary proceeding 98–1754.

3. The August 20, 2004, Minutes of Proceeding and Oral Ruling reflect the Court's Order

denying Mr. Greene's claims seeking exception to discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6).

4. The September 2, 2004, Findings of Fact, Conclusions of Law and Order memorializes the essential findings and conclusions stated on the record in open court on August 20, 2004.

(Docket # 230),[5] and (d) Findings of Fact, Conclusions of Law and Order dated May 27, 2005 (Docket # 276).[6]

As a general observation, certain unusual features of this case make it particularly difficult to craft a cogent and carefully delineated opinion. These features include: the passage of about 15 years since much of the dispute between Mr. Burke and Mr. Greene occurred; the inconsistencies and problems intrinsic in the English–Spanish translations of important documents, testimony and depositions; the lack of credibility of both principals in this case, Mr. Burke and Mr. Greene;[7] and the bitter, enduring personal enmity and palpable animosity between these two individuals. The findings of fact and conclusions drawn by the Court are the product of this most unsatisfactory wellspring of history.

For purposes of understanding the history of this dispute and the organization of this opinion, there are three central areas of discussion:

1. The much-disputed $250,000 I.O.U. which forms the initial basis of Mr. Greene's claim of a debt owing to him from the Debtor, Mr. Burke.

2. The hotly-contested subsequent entry of a judgment in a Mexican court against the Debtor and in favor of Mr. Greene for $999,999.00 (dollars) or $999,999.00 (pesos) which forms the basis of the putative foreign judgment on which Mr. Greene has sought to gain recognition, domestication and enforcement of his claim in United States courts.

3. The proceedings in Colorado State District Court immediately preceding Debtor's filing bankruptcy which form the basis of Mr. Greene's claim filed in this Bankruptcy Court.

## A. Formation of the business

Mr. Greene and Mr. Burke were the major principals in a start-up business venture to develop and operate a restaurant and cantina, the Baja Cantina, and other pursuits in Cabo San Lucas, Mexico, starting in 1990. Mr. Greene and Mr. Burke were on the board of directors of a U.S. corporation known as 1811 South Downing Street, Inc. which was formed for the purpose of being the parent corporation for the Baja Cantina. A total of $250,000 was invested in the business venture, including $110,000 by Mr. Greene who held 15.4% of the stock. Mr. Burke did not invest any money, but owned 51% of the business. His ownership interest was acquired, or to be acquired, by his ideas, knowledge, experience and restaurant management ability. A Mexican corporation known as Baja Cantina, S.A. de C.V. was formed at some point by Mr. Burke and was the operating entity for the restaurant which opened in November 1990.

The relationship between, and the transition of financing, administration and operations of the Baja Cantina business from

---

5. The March 18, 2005, Order denied the relief sought by Mr. Greene in his Suggestion of Lack of Subject Matter Jurisdiction. The Court ruled that it does have subject matter jurisdiction to adjudicate Mr. Burke's objection to the claim filed by Mr. Greene.

6. The May 27, 2005 Order, granted Mr. Burke's Motion for Hearing on Objection to Claim of Mr. Greene, denied Mr. Greene's Request for Clarification of the Scope of the

Court's Findings of Fact, Conclusions of Law and Order (Docket # 185) and held that Mr. Burke has standing to object to Mr. Greene's bankruptcy claim.

7. It is not unimportant to note that in the absence of credibility and persuasiveness of Mr. Burke and Mr. Greene, the Court did find credible and more persuasive Mr. Chris Watts and Mr. Mercado Hernandez.

1811 Downing Street, Inc. to Baja Cantina, S.A. de C.V., is contested, confusing and unclear.

Mr. Burke was the CEO and "administrator"—the Administrator Unico—of the Baja Cantina, and Mr. Greene was an important principal, acting as an assistant administrator and keeping the financial books from about November 1990 to sometime in April to June 1991. While Mr. Burke was the central and driving force behind the ill-starred venture, Mr. Greene was the money-man and "behind-the-scene" organizational man. Mr. Greene also had some control of, or access to, the method and system of keeping the business's books and records, and, intermittently, undertook other activities at and for the business in Cabo San Lucas, until he was no longer working at the Baja Cantina after May 1994.[8]

The precise role, responsibilities and actual activities of Mr. Burke and Mr. Greene relative to the business were never clearly delineated or well-defined. The Court has previously discussed the relative positions and activities undertaken in the business during its operations, 1990–1994, and adopts those findings and conclusions herein. In brief, the Court views Mr. Greene as the more educated, more financially and business savvy, more technically skilled and more sophisticated of the two. By comparison, Mr. Burke was more the restaurant manager, day to day operations director and not steeped in business or financial acumen, and not skilled or sophisticated in either business administration or, for example, automation.

**8.** Mr. Greene even referred to himself as a "working manager" of the business. Greene Exhibit 32, page 2.

**9.** Mr. Greene's Exhibit 25 (written report of meeting).

### B. The $250,000 I.O.U.

Between November 1990 and the summer of 1992, important problems and disputes were already brewing. On or about July 22, 1992, Mr. Greene, Mr. Burke and another investor, Chris Watts, had a meeting in Cabo San Lucas at Dudley's restaurant regarding several business matters. The written report of this meeting, prepared by Mr. Greene, indicates that the parties discussed: (1) Mr. Greene's concern over money of the Baja Cantina being spent on enterprises other than the Baja Cantina restaurant, (2) the dispute between Mr. Greene and Mr. Burke regarding the payment of a salary to Mr. Burke, (3) reevaluation of company perks for the officers, (4) concern regarding that the company bills were not being paid, but that monies were being withdrawn as salaries, (5) the sale of company stock, (6) that there was an interested party in possibly purchasing part of the Baja Cantina, (7) the possibility of a sale, (8) the question of back pay owed to Mr. Burke and Mr. Greene, (9) the mortgage on the property, (10) a loan by Mr. Watts, (11) concern regarding why the stock in both the Mexican and American corporations had not been issued to everyone, and (12) concern that the Baja Cantina had never held a shareholders meeting.[9]

This meeting evidently resulted in the August 8, 1992, I.O.U. which was ostensibly executed by Mr. Greene (as holder in receipt) and Mr. Burke (as the debtor, as the executive officer of the business and/or individually) in the amount of $250,000.[10] However, not unimportantly, the written report of that meeting does *not* mention a $250,000 I.O.U. to be signed by Mr. Burke.[11]

**10.** Mr. Greene's Exhibit 7 (English) and Mr. Greene's Exhibit 8 (Spanish).

**11.** Mr. Greene's Exhibit 25 (written report of meeting).

Mr. Burke has alleged that he did not sign the I.O.U. In support of this, Mr. Burke testified that he signed several pieces of Baja Cantina letterhead in blank (as he had done on a number of occasions, particularly when he was out of town) and that Mr. Greene typed this I.O.U. on the presigned letterhead. Mr. Chris Watts testified that Mr. Burke did keep letterhead signed in blank in the Baja Cantina safe, however Mr. Greene testified that he did not recall Mr. Burke ever doing so.[12] Mr. Watts also testified that at the July 22, 1992 meeting, there was no mention of Mr. Burke having executed, or needing to execute in the future, a $250,000 promissory note.[13] Mr. Burke asserts that even if the Court finds that he did indeed sign the I.O.U., that the I.O.U. is not a personal obligation, but rather a corporate obligation of the Baja Cantina. Mr. Greene testified that the I.O.U. was originally drafted by Mr. Burke and obligated only Mr. Burke individually, but that after discussions between the two, that they agreed that both Mr. Burke individually and the Baja Cantina, S.A. de C.V. would be liable on the I.O.U.[14] Mr. Burke testified that he does not own a computer, does not type, and thus the I.O.U. was prepared by Mr. Greene.[15] The Affidavit that Mr. Greene signed and turned into the police in Cabo San Lucas states that Mr. Greene typed out the I.O.U.[16]

The parties presented two expert witnesses during the trial of this matter on December 8, 2006. Mr. Burke called Richard Lewis. Mr. Lewis testified that he spent about 30 minutes in Cabo San Lucas reviewing the I.O.U.[17] While there he photographed the I.O.U. and concluded that the signature line on the I.O.U. was above the signature. Thus, corroborating Mr. Burke's assertion that he signed several pieces of letterhead stationery in blank and that Greene typed the I.O.U. after the fact on the presigned letterhead. This Court observes, however, that, while credible, Mr. Lewis's examination of the document seemed hurried and not optimal.

Mr. Greene's expert, Charla Janney, on the other hand, spent considerably more time examining the document and undertook a seemingly more intensive and complete analysis of the note; she utilized a Fuji S1 6 megapixel camera with two lenses, one being a single lens that goes from 28 to 105 millimeters and another 60 millimeter lens for close up work; she had better lighting and ancillary equipment.[18] She utilized a stereo microscope to examine the original document.[19] Her expert opinion was that the signature was over the signature line.[20] Thus, she concluded

12. Transcript, page 66, lines 18–25, and page 67, lines 1–19, Watts testimony (July 27, 2006)(Docket # 401). Transcript, page 221, lines 21–25, Mr. Greene testimony (July 27, 2006)(Docket # 401).

13. Transcript, page 72, lines 18–24, Watts testimony (July 27, 2006)(Docket # 401).

14. Transcript, page 234, line 23 to page 235, line 3, Mr. Greene testimony (July 27, 2006)(Docket # 401). Transcript, page 26, line 17 to page 27, line 20, page 96, line 11 to page 97, line 8 Mr. Greene testimony (July 28, 2007)(Docket # 402). Transcript, page 38–39, Mr. Greene testimony (August 15, 2006)(Docket # 403).

15. Transcript, page 53–55, Mr. Burke's testimony (July 26, 2006)(Docket # 400).

16. Exhibit 19, page 3.

17. Transcript, page 16, lines 16–20, Lewis testimony (December 8, 2006) Docket # s396 and 404. Two transcripts of this hearing are filed with the Court. The Court will hereafter refer to the Transcript located at Docket # 396.

18. Transcript, page 82, lines 14–19 Janney testimony (December 8, 2006)(Docket # 396).

19. Transcript, page 83, line 10 Janney testimony (December 8, 2006)(Docket # 396).

20. Transcript, pages 92–109 Janney testimony (December 8, 2006)(Docket # 396).

the signature of Mr. Burke was placed on the document *after* it was prepared and submitted, and that the note was, thus, signed by Burke.

## C. The Mexico Court Proceedings Resulting in a Judgment

In August 1993, Mr. Greene filed a criminal complaint against Mr. Burke with the Cabo San Lucas police.[21] He alleged wrongdoing by Burke in the management and operations of the restaurant. It does not appear from the evidence presented to the Court that there were any formal charges, trial or conviction based upon this criminal complaint. Mr. Burke maintains the charges were trumped up and intended to intimidate and extract concessions from him by Mr. Greene.

On or about November 10, 1993, Mr. Burke, Mr. Greene and other investors held a stockholders meeting of 1811 South Downing, Inc. at the Coronado Bay Resort in San Diego, California. While a variety of topics were discussed, the Minutes of this meeting do not reflect any discussion of a criminal complaint against Mr. Burke or the Baja Cantina and the Minutes do not reflect any discussion of the $250,000 I.O.U.[22] Further, Mr. Watts testified that at the November 10, 1993 meeting, there was no mention of an I.O.U. executed by Mr. Burke.[23]

And, an "Investigative Report," surreptitiously requested by Mr. Greene and conducted by private investigator Mick W. Omun, does raise allegations of civil and criminal violations of the laws of the State of Colorado, the United States and Mexico and it references that Mr. Burke signed documents on August 8, 1992, but does not specifically mention the $250,000 I.O.U.[24] It is unclear if this Investigative Report was presented to those in attendance at the November 10, 1993 meeting.

The Report and Mr. Omun are of dubious origins and value. Consequently, the Court does not find Mr. Omun's "Investigative Report" to have much weight or credibility. He was hired by Mr. Greene to investigate Mr. Burke and others. His "Investigative Report" is amateurish, incomplete at times, unnecessarily malicious towards Burke, and contains superfluous materials.[25] For example, the "Investigative Report" is not all in the same font typeface and font size, there are numerous misspellings, the report pages are not numbered, the report references attachments, but the attachments are not in the exhibit, the report includes obscure facts regarding Mr. Greene's and Mr. Burke's childhood and affairs that Mr. Burke allegedly had in Mexico. And there are 2 documents that follow the report. They are both two pages long and are both entitled, "General Agreement." The Omun report is dated October 5, 1993 and the two unsigned "General Agreements" are dated November 1994, so, evidently, they are not part of the October 1993 Investigative Report.

On May 19, 1994, Mr. Greene filed a lawsuit in the Court of First Instance, in Cabo San Lucas, B.C.S., Mexico. The case is captioned Leonel Castro Cadena[26] v.s. John R. Burke y/o Baja Cantina, S.A.

---

21. Transcript, page 37, lines 5–8, Mr. Greene's testimony (July 28, 2007)(Docket # 402).

22. Mr. Burke's Exhibit O, Mr. Greene's Exhibit 28.

23. Transcript, page 74, lines 22–24, Watts testimony (July 27, 2006)(Docket # 401).

24. Exhibit 90, "Investigative Report" dated October 5, 1993.

25. Exhibit 90, "Investigative Report" dated October 5, 1993.

26. Mr. Castro was Mr. Greene's attorney at the time.

de C.V. and was assigned case number 296/994.[27]

On November 4, 1994, Mr. Greene had executed a Mexican legal procedure called an "embargo," which seized Baja Cantina assets.[28] Mr. Burke testified that Mr. Greene, along with approximately 15 people, confronted him with the embargo from a court and seized the Baja Cantina cash box.[29] Mr. Greene admits that the embargo was against the Baja Cantina only and not against Mr. Burke personally.[30] Mr. Burke claims he was not aware of the lawsuit initiated by Mr. Greene, or the existence of the I.O.U., until the embargo on November 4, 1994, and that he was never served with process or otherwise notified of the May 1994 lawsuit.[31] Mr. Watts also testified that he was not aware of the lawsuit by Mr. Greene or the $250,000 I.O.U. until the embargo.[32] In connection with both the May 1994 lawsuit and the November 1994 embargo, Mr. Burke alleges that Mr. Greene bragged about bribing a judge to enter the $250,000 I.O.U. into the court system without Mr. Burke being notified and to obtain the embargo on the Baja Cantina.[33] Mr. Greene denied ever paying a bribe to anyone.[34]

Mr. Greene testified that in between the time frame of filing the lawsuit (on May 19, 1994) and the time of the embargo (on November 4, 1994) that there were no hearings and no court proceedings that he was involved in.[35]

Curiously, the parties introduced a letter typed and signed by Mr. Greene dated May 25, 1994, that was sent to the shareholders of the Baja Cantina. It is six pages in length and does not mention the alleged May 19, 1994 lawsuit filed by Mr. Greene.[36]

On January 6, 1995, the Mexican Court conducted a proceeding wherein a Settlement Agreement was executed by Mr. Greene, Mr. Burke and a representative of Thai Pan Dos, Inc.[37] and made a judgment of the Mexican Court (the "Mexican Judgment"). The Settlement Agreement was drafted by Mr. Greene's attorney at the time, Leonel Castro.[38] The Mexican Judg-

27. Transcript, page 25, lines 19–23 and page 29, lines 3–10, Mr. Greene's testimony (July 28, 2006)(Docket # 402). Mr. Greene's Exhibit 40.

28. Transcript, page 55, Mr. Burke's testimony (July 26, 2006)(Docket # 400).

29. Transcript, page 67, Mr. Burke's testimony (July 26, 2006)(Docket # 400).

30. Transcript, page 28, lines 16–18, Mr. Greene's testimony (July 28, 2006)(Docket # 402).

31. Transcript, page 68, Mr. Burke's testimony (July 26, 2006)(Docket # 400).

32. Transcript, page 74, line 25 to page 75, line 4 and page 76, lines 6–9, Watts testimony (July 27, 2006)(Docket # 401).

33. Transcript, page 69, line 25 to page 70, line 1, Mr. Burke's testimony (July 26, 2006)(Docket # 400). Transcript, page 28, lines 13–25, and page 29, lines 1–8, Mr.

Burke's testimony (July 27, 2006)(Docket # 401).

34. Transcript, page 95, line 7–20, Mr. Greene's testimony (July 28, 2006)(Docket # 402).

35. Transcript, page 52, line 22 to page 53, line 17, Mr. Greene's testimony (July 28, 2006)(Docket # 402).

36. Exhibit 32.

37. The Court understands Thai Pan Dos to be the corporation owned by Roberto Marino that purchased the Baja Cantina restaurant business. Areli Sanchez was the Administrator Unico for Thai Pan Dos.

38. Transcript, page 41, lines 24–25, Mr. Greene's testimony (August 15, 2006)(Docket # 403). Transcript, page 69, lines 2–5, Mr. Greene's testimony (July 28, 2006)(Docket # 402).

ment is captioned in Spanish as *"Richard Greene v. Baja Cantina S.A. de C.V. y Otro"* [39] and in one English version as *"Richard Greene v. Baja Cantina S.A. de C.V."* [40] and in the other English version as *"Richard Greene v. Baja Cantina S.A. de C.V. and Other."* [41] As more fully set forth below, Mr. Burke disputes that he is personally liable, or was intended to be personally liable, on the Mexican Judgment and that the Mexican Judgment was obtained by fraud.

A factor here is that the English and Spanish translations of the Settlement Agreement differ.[42] Mr. Burke/Baja Cantina are referred to in the singular as "Respondent" and "Defendant." The Settlement Agreement has various curiosities and inconsistencies, not the least of which are the status of the obligor (Baja Cantina S.A. de C.V. *and/or* John R. Burke); the one-hundred-twenty $8,333.00 promissory notes contemplated but never produced; absence of signatures on the English version, but signatures on the Spanish version only, etc. The Court in attempting to ascertain what occurred and who is obligated here, has reviewed its notes from the trial, the documents and the telephonic depositions of Fernando Garibay, Clicerio Mercado Hernandez and James Sacco.[43]

Fernando Garibay, an attorney in Mexico, was retained by Mr. Greene *after* the underlying events of this case. His testimony is that the Settlement Agreement obligates Mr. Burke, individually. The original case was filed against Mr. Burke and Baja Cantina. The Mexican Judgment is against both and there was no appeal by Mr. Burke of this judgment. Mr. Garibay's testimony would reflect that the Mexican Judgment is for 999,960 U.S. Dollars, not Pesos. His review is forensic and strictly retrospective in nature and his testimony's weight and persuasiveness is thereby diminished.[44] Moreover, the questions presented to him during the telephonic deposition are replete with leading questions and testimony that is, for the most part, presented by Mr. Greene's other counsel, Mr. Shearer.

Clicerio Mercado Hernandez is a businessman in Mexico who worked with the Baja Cantina and the parties herein. The Court has examined both the transcript of his video deposition and the video deposition itself and specifically finds Mr. Hernandez to be credible. His testimony demonstrates that the events surrounding the settlement and the inconsistent terminology in the various agreements, various copies and iterations thereof, and the Mexican Judgment reflect the hopeless and seemingly irreconcilable problems in the case. Key to his testimony is that he maintains that the Mexican Judgment was procured by a $20,000.00 bribe.[45] In addi-

---

**39.** Mr. Greene's Exhibit 1 and 3. Although Mr. Green is the only Plaintiff listed, he contends that he represented, by way of Powers of Attorney, other cash investors including Karl Piepho, David Kodama, Tom and Dafna Wolters. Powers of Attorney at Exhibits 20–23.

**40.** Mr. Greene's Exhibit 4, translation by Maria Freiberg.

**41.** Mr. Greene's Exhibit 2, translation by Alejandra Vellanoweth.

**42.** Exhibits 1 and 2.

**43.** Mr. Sacco's Telephone Deposition is given very little credibility by this Court. He re-

counts various purported acts of Burke that were illegal and/or deceptive, self-serving and cheating of the investors. Despite his ongoing knowledge of same, he acknowledges that he never told anyone at any time—and, indeed, enabled these acts, including: (1) keeping two sets of business books and helping hide them; (2) skimming $300.00 a day from the cambio; and (4) and hiding cash from the business and Mr. Greene.

**44.** Telephone Deposition of Fernando Garibay (June 29, 1998).

**45.** Video Deposition of Clicerio Mercado Hernandez, page 92, line 10 to page 93, line 23,

tion, Mr. Hernandez testified that the Mexican Judgment is for 999,960 pesos, not U.S. Dollars.[46] He testified that, in Mexico, Pesos is referred to as an S with a single line through it, i.e. $.[47] American Dollars, on the other hand, are designated by an S with two lines through it, i.e., $.[48] Moreover, because the parties were before a Mexican Court it was understood that it was in Pesos.[49]

### D. Denver District Court

On April 3, 1998, Mr. Greene filed his Verified Petition Seeking Registration, Recognition and Enforcement of Foreign Judgment ("Verified Petition") in the District Court, Denver County, State of Colorado, *Richard Greene v. John R. Burke, et al.*, Case No. 98 CV 2831 ("Denver District Court").[50] The Verified Petition was filed "pursuant to the Uniform Enforcement of Foreign Judgments Act, § 13–53–101, C.R.S., *et seq.* and other applicable law."

The Denver District Court recognized and domesticated the Mexican Judgment and issued a Transcript of Judgment on April 13, 1998 ("Colorado Judgment").[51] Mr. Greene recorded a certified copy of the Transcript of Judgment with the Denver County Clerk and Recorder's Office, thereby effecting a judgment lien on Mr. Burke's real property in Denver County. From the date of the entry of the Colorado Judgment on April 3, 1998, until the time Mr. Burke filed bankruptcy on October 30, 1998, post-judgment collection proceedings took place. Specifically, the Denver District Court issued garnishments at Mr.

Greene's request, and accepted garnisheed funds from rents paid by a commercial tenant of Mr. Burke into the Registry of the Court.

On April 23, 1998 (20 days after the Verified Petition was filed), Mr. Burke filed a Verified Answer to the Verified Petition raising jurisdictional and procedural defects and fraud as defenses.[52] Specifically, the Verified Answer states as follows:

1) This matter was improperly brought before the Court under CoLo.REV. STAT. § 13–53–101 *et seq.*, the Uniform Enforcement of Foreign Judgments Act. That Act relates specifically to judgments which are "of a court of the United States or of any other court which is entitled to full faith and credit in this state." The matter before the Court involves an allegedly final judgment from Mexico. Judgments from foreign nations are not entitled to the same constitutional protection of full faith and credit as judgments from other states in the Union. This matter would properly have been brought under CoLo.REV.STAT. § 13–62–101 *et seq.*, the Uniform Foreign Money Judgments Recognition Act.

2) The "judgment" entered in Mexico was obtained by fraud, and is therefore not entitled to enforcement in this state.[53]

3) When Mr. Burke agreed to settle this matter on behalf of the Baja

---

page 103, line 25 to page 105, line 24 (March 4, 2004).

**46.** Video Deposition of Clicerio Mercado Hernandez, page 89, line 7 to page 91, line 17 (March 4, 2004).

**47.** Video Deposition of Clicerio Mercado Hernandez, page 89, lines 17–24 (March 4, 2004).

**48.** *Id.*

**49.** Video Deposition of Clicerio Mercado Hernandez, page 90, line 11 to page 93, line 23.

**50.** Mr. Greene's Exhibit 67.

**51.** Mr. Greene's Exhibit 69.

**52.** Mr. Greene's Exhibit 68.

**53.** CoLo.REV.STAT. § 13–62–105.

Cantina, he did so based on a translation of the proceeding in which he was told that the amount owed was 990,000 Mexican pesos. When the order was reduced to a writing, however, the amount owed was 990,000 U.S. dollars. This error amounts to a material mistake which may render the "agreement" invalid. However, this issue should be pursued in its original forum.

4) It is common knowledge that fraudulent conduct, bribery, corruption and lawlessness are rampant in the Mexican court system. Such judgments are not offered by an "impartial tribunal," and are therefore not entitled to recognition or enforcement.

5) The "judgment" entered in Mexico did not ensure basic due process protections guaranteed to parties to a civil action in the courts of Colorado. For example, Mexican rules for procedure do not require that a defendant receive personal service to obtain jurisdiction over him. Many other such due process violations occur in Mexican courts. As a result, a judgment obtained without these due process protections is not conclusive under Colorado law and may not be enforced.[54]

6) Mr. Burke was not named in an individual capacity in the Mexican case. His signature on the paperwork (submitted by the Plaintiff as a "final judgment") is in his capacity as an officer of the corporation, the Baja Cantina, S.A. De C.V. Despite the fact that he was not a party to the action, the Plaintiff attempts to enforce this judgment against Mr. Burke in an individual capacity. In essence, the Plaintiff is attempting to pierce the corporate veil of a Mexican corporation in a Colorado courtroom. It is inappropriate for the courts in Colorado to attempt to interpret when and how an individual may be liable for the debts of a corporation in Mexico. However, if the court decides that it may determine such an issue, it is against the public policy of the State of Colorado to attach personal liability for the debts of a corporation.

7) Mr. Burke denies that a final judgment was been entered against him.

8) Mr. Burke denies that the amount of outstanding debt, if any, is 999,960.00 U.S. Dollars.

9) Mr. Burke denies that the "judgment" has not been paid in full or in part.

10) Mr. Burke denies that the last known post office address of the Baja Cantina, S.A. De C.V. was in his care.

Mr. Greene claims that Mr. Burke's Verified Answer was untimely pursuant to COLO.REV.STAT. § 13–53–104(3) which states that "No execution or other process for enforcement of a foreign judgment filed under this article shall issue until ten days after the date the judgment is filed." This is the only time period mentioned in either the Enforcement Act or the Recognition Act. Section 13–53–104(3) does not state that a defendant must file an answer within 10 days. Rule 12(a) of the Colorado Rules of Civil Procedure provides that, "A defendant shall file his answer or other response within twenty days after the service of the summons and complaint on him." Mr. Burke's Verified Answer could also be construed as a Motion for Relief From Judgment pursuant to Rule 60 of the Colorado Rules of Civil Procedure. Therefore, this Court finds that Mr.

54. COLO.REV.STAT. § 13–62–105.

Burke's Verified Answer was a timely response to the Verified Petition.

The Denver District Court set Mr. Burke's Verified Answer for a hearing scheduled to take place on July 2, 1998. This hearing was continued at the request of Mr. Burke and the Denver District Court rescheduled the hearing for November 5, 1998. Mr. Burke filed his Chapter 11 Petition prior to the date set for the Denver District Court to hear the matter, therefore, the matter was never resolved or finalized in Denver District Court.

### E. *Bankruptcy Proceeding*

On October 30, 1998, Mr. Burke filed his voluntary petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code, Case No. 98–25466. Soon thereafter, on December 7, 1998, Mr. Burke filed an Adversary Proceeding against Richard Greene, Adv. Pro. 98–1754. On February 23, 1999, Mr. Greene filed a Complaint to Determine Dischargeability against Mr. Burke pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6), Adv. Pro. 99–1117. On June 2, 1999, these two adversary proceedings were consolidated under Adv. Pro. 98–1754, and are summarized below. Mr. Burke's Chapter 11 proceeding was converted to Chapter 7 on January 25, 2000 and Albert Hoffman was appointed as the Chapter 7 Trustee. Mr. Burke was thereafter discharged on April 28, 2000.

### 1. *Hoffman v. Greene, et al.,* Adversary Proceeding, 98–1754

On May 16, 2000, the Chapter 7 Trustee was substituted as plaintiff in place of Mr. Burke in Adversary Proceeding 98–1754. On June 2, 2000, the Chapter 7 Trustee filed an Amended Complaint including the following claims for relief: (1) Avoidance of Judicial Lien Security Interest by Trustee Under Section 544, (2) Objection to Allowance of Claims and Interests of Mr. Greene Pursuant to Section 502, (3) Execution and Garnishment—Preferential Transfer Under Section 547(b), (4) Subordination of Claim Pursuant to Section 510(b), (5) Equitable Subordination Under Section 510(c)(1) and (2), (6) Effect of Distribution Under Section 508(a), and (7) Declaratory Judgment that Funds Held by the Clerk are Property of the Estate and Should be Turned Order to the Trustee Pursuant to Section 543(b).[55]

On June 23, 2000, the Chapter 7 Trustee filed a Motion for Partial Summary Judgment in Adversary Proceeding 98–1754.[56] The Motion for Partial Summary Judgment sought a determination that the Denver District Court did not have subject matter jurisdiction over the Mexican Judgment and that the judgment could not be recognized and enforced in the United States without a prior hearing. Mr. Greene filed a Response and Cross Motion for Summary Judgment.

On August 28, 2000, the late Bankruptcy Judge Donald E. Cordova issued his Order Regarding Cross Motions for Partial Summary Judgment ("Summary Judgment Order").[57] Judge Cordova concluded that, with respect to the arguments regarding res judicata, full faith and credit, and comity made by Mr. Greene:

> the issues of fairness and due process regarding the Mexican judgment have not yet been resolved, so the Court lacks sufficient information to determine whether the judgment may be recognized under *Hilton v. Guyot*[58] principles of comity. Since the judgment is not

---

55. Docket # 48.

56. Docket # 53.

57. Docket # 67.

58. *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895)

presently recognized, it may not presently be enforced, nor was its enforcement proper on the date of the filing of the bankruptcy petition. Similarly, other factual issues surrounding the Mexican judgment must await resolution at trial. With the exception of finding that enforcement of the Mexican judgment, and hence the security interest, was not valid as of the date of filing, the Court finds that all other issues raised by the parties retain significant questions of fact to be determined at trial, making summary judgment inappropriate.

Judge Cordova's ruling appears to state that the Mexican Judgment was not then presently recognized since the hearing scheduled for November 5, 1998, was stayed by the bankruptcy filing. And that since there was no proper recognition, there could then be no proper enforcement, and thus no proper lien. Judge Cordova granted the Trustee's motion for summary judgment, in part, however, on the assertion that Mr. Greene had no security interest in Mr. Burke's property based upon the Colorado Judgment.

On September 5, 2000, Mr. Greene appealed Judge Cordova's Summary Judgment Order to the United States District Court for the District of Colorado. On October 7, 2002, Judge Robert E. Blackburn issued his Order on the appeal.[59] Specifically, Judge Blackburn ordered:

1.  That the Bankruptcy Court **DID NOT ERR** as a matter of law in determining that it had jurisdiction to hear the trustee's challenge to the Colorado Judgment and his collateral attack on the Denver District Court's enforcement of the Mexican Judgment and issuance of a corresponding Colorado Judgment;
2.  That the Bankruptcy Court **ERRED** as a matter of law by determining, prior to resolving the validity of the underly-

ing Mexican Judgment and the Colorado Judgment, that Creditor's enforcement of the Mexican Judgment, and the concomitant lien, was not valid as of the date of the filing;
3.  That the Bankruptcy Court's finding that Creditor's enforcement of the Mexican Judgment and resultant lien was not valid as of the date of the filing is **REVERSED AND REMANDED** with instructions to resolve the validity of both the Mexican and Colorado Judgments; and
4.  That until such resolution, the Colorado Judgment remains as a putatively valid judgment lien against the estate of the Debtor.

Judge Blackburn discussed the facts regarding the filing of the Verified Petition and Transcript of Judgment, and states at page 10 of his Order:

Therefore, Creditor had a valid lien upon the recording of the Transcript of Judgment with the clerk on April 13, 1998. The Bankruptcy Court erred as a matter of law by concluding otherwise without first resolving the issue of whether or not the Mexican and Colorado Judgments are valid. Until it concludes otherwise, the Mexican Judgment remains valid, as does the Colorado Judgment recognizing the Mexican Judgment and the subsequent Transcript of Judgment. It remains to be seen whether or not the Bankruptcy Court will ultimately conclude that the Colorado State Court improperly entered a judgment that it did not have the authority to recognize or conclude that the Mexican Judgment was so riddled with fraud that it must be set aside. Until the Bankruptcy Court renders such findings of fact and conclusions of law, however, the Transcript of Judg-

---

**59.** Docket # 87.

ment stands and the Colorado Judgment remains a valid judgment lien. Simply put, the Bankruptcy Court got it backwards; it should have first resolved whether the Colorado and Mexican Judgments were valid before voiding the otherwise properly recorded lien. The transcript of judgment is not presently invalid or ineffectively simply because it may later be voided through by a determination that the underlying Mexican Judgment should not have been recognized by the Denver District Court.

On June 10, 2004, a settlement was reached between the Trustee and Mr. Greene. Subsequently, on June 23, 2004, the Trustee and Mr. Greene entered into a written formal Settlement Agreement. Bankruptcy Judge Michael E. Romero approved the Settlement Agreement on July 20, 2004. Thereafter, the Trustee and Mr. Greene memorialized an Amendment to the Settlement Agreement and the Court, on December 30, 2004, entered an Order Adopting the Amendment to the Settlement Agreement. Pursuant to the terms of the Settlement Agreement, the Trustee and Mr. Greene settled all rights and claims the Trustee may have had to challenge the Mexican Judgment and the Colorado Judgment on behalf of the bankruptcy estate of Mr. Burke. The Settlement Agreement did not resolve the disputes between Mr. Burke and Mr. Greene. At the July 20, 2004 hearing, when the Settlement Agreement was approved, Judge Romero stated:

As we indicated at the beginning, this Court is not making a ruling as to the right of Mr. Burke to individually assert

and individually challenge the claim of Mr. Greene. That is not before the Court today. It is not going to rule on that today. Presumably, Judge Brooks may render a ruling with respect to that on the adversary proceeding next week. But I am not even going to (inaudible) to guess on that. I just want to make it clear, I am not ruling on that today.

The Settlement Agreement also explicitly states that it does not resolve the disputes between Mr. Burke and Mr. Greene, as paragraph 6 states as follows:

The Trustee will take no legal position regarding, and will not seek to intervene with respect to, Greene's non-dischargeability claim against Burke in the Adversary Proceeding, ... This Agreement does not include Burke as a party, and is not intended to release any legal claim that Greene has against Burke, including but not limited to the non-dischargeability claim, ...

Mr. Burke has in fact continued to pursue, and in this adversary proceeding continues, his objection to Mr. Greene's bankruptcy claim. This Court previously found that Mr. Burke has standing to object to Mr. Greene's bankruptcy claim.[60]

### 2. *Greene v. Burke,* Adversary Proceeding 99–1117

On February 23, 1999, Mr. Greene filed a Complaint to Determine Dischargeability against Mr. Burke pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6). A trial on the Section 523 claims was conducted on July 27–28, 2004, and August 5, 2004. Mr. Greene appeared and was represented by his counsel, Richard L. Shearer and Rob-

---

**60.** *See* Findings of Fact, Conclusions of Law and Order dated May 27, 2005 (Docket # 276) ("Burke has standing to object to Mr. Greene's bankruptcy claim. It appears that there would be a substantial surplus in the bankruptcy estate available for distribution after unsecured creditor claims are paid, if Mr. Greene's claim were disallowed. Case

law establishes that Mr. Burke is not barred from objecting to a creditor's claim. *In re White,* 260 B.R. 870, 875 (8th Cir.[BAP]2001). *See also Kieffer v. Riske (In re Kieffer–Mickes, Inc.),* 226 B.R. 204, 209 (8th Cir.BAP 1998). See also 11 U.S.C. § 502, and Bankruptcy Rule 3007.")

ert Anderson. Mr. Burke also appeared and was represented by his counsel, Maria Flora.

On September 2, 2004, this Court issued Findings of Fact, Conclusions or Law and Order denying Mr. Greene's claims seeking exception to discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6).[61] Regarding the allegations of false representations or false pretenses under 11 U.S.C. § 523(a)(2)(A), the Court found that Mr. Greene did not carry his burden of proof to show a false representation made by Mr. Burke with intent to deceive, and justifiable reliance on the part of Mr. Greene, causing a loss. In making this finding, the Court noted that Mr. Greene participated in the events that caused all parties to lose in the venture and that any reliance was not justified. With respect to the allegations under 11 U.S.C. § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny, the Court found that Mr. Burke was not a fiduciary; there was no express or technical trust and there was no showing of any trust res. Further, the Court found that Mr. Burke did not have exclusive access to or control of the investment funds, business assets, proceeds, and cash. On the third claim under 11 U.S.C. § 523(a)(6), the Court found that Mr. Greene did not carry his burden of proof as the evidence did not show conversion or a wilful or malicious injury, and instead reflected neglect, confusion, and irresponsible management by both Mr. Burke and Mr. Greene.

As noted above, the September 2, 2004, Order concluded the first phase of this adversary proceeding and further ordered that either party may file a Motion on or before September 15, 2004, to request a hearing on any remaining issues that must be determined in this adversary proceeding. On September 15, 2004, Mr. Burke filed a Motion for Hearing on Objection to Claim of Richard Greene. On April 15, 2005, this Court granted Mr. Burke's Motion for Hearing on Objection to Claim of Richard Greene. A trial on the claim objection was conducted on July 26–28, 2006, August 15, 2006 and December 8, 2006. This Court now makes the following findings of Fact, Conclusions of Law and Orders regarding the validity of the Mexican and Colorado judgments.

## II. *Validity of the I.O.U.*

■ Mr. Burke alleges that he did not sign the I.O.U. As set forth above, the Court believes he likely did sign the I.O.U. The Court reaches this conclusion based upon the expert testimony of Charla Janney. But that does not end this Court's inquiry. The I.O.U. itself is also subject to seemingly endless inconsistencies, different interpretations, and problematic features. The I.O.U. does not appear to solely bind Mr. Burke, individually. It does, however, seem intended to bind the Baja Cantina, S.A. de C.V.[62]

Mr. Green claims that the I.O.U. followed a July 22, 1992 meeting in which Mr. Green, Mr. Burke and Mr. Watts had attended. The written report of the meeting makes no mention of the I.O.U. Mr. Green was the drafter of the meeting report. Moreover, he was the drafter of the I.O.U.

---

61. *See* Minutes of Proceeding and Oral Ruling on the record dated August 20, 2004 (Docket # 178) and Findings of Fact, Conclusions of Law and Order dated September 2, 2004 (Docket # 180).

62. Transcript, page 234, line 23 to page 235, line 3, Mr. Greene's testimony (July 27, 2006)(Docket # 401). Transcript, page 26, line 17 to page 27, line 20, page 96, line 11 to page 97, line 8 Mr. Greene's testimony (July 28, 2007)(Docket # 402). Transcript, page 38–39, Mr. Greene's testimony (August 15, 2006)(Docket # 403).

The Court concludes that, indeed, the I.O.U. was likely signed by Mr. Burke, but the content, circumstances surrounding execution, failure to timely disclose the note to other shareholders, and disputed testimony diminishes the weight and confidence of such a conclusion.

Nonetheless, by a preponderance of the evidence, Mr. Greene has proven the existence of the I.O.U., and that it was signed by Mr. Burke. That leaves the important question of who/what is liable on that I.O.U. I conclude that the business, Baja Cantina, S.A. de C.V., was intended to be and is liable on the note. I cannot conclude the same with respect to Mr. Burke. Mr. Greene has not proved, by a preponderance of the evidence, that Mr. Burke was intended to be or is liable on the I.O.U.

### III. *Validity of the Colorado and Mexican Judgments*

The central issues here—and the mandate issued by Judge Blackburn—are to examine the Mexican Judgment and the Colorado Judgment and determine the propriety, legitimacy, legal sufficiency and enforceability of the judgments.

Throughout the bankruptcy proceeding, Mr. Burke has claimed that the Mexican court did not have personal jurisdiction over him; that the Mexican Judgment does not bind him personally, but only the Baja Cantina S.A. de C.V.; that the Mexican Judgment was procured by fraud (including an inaccurate oral translation at the proceeding regarding the currency and liability, that the proceedings were held after regular court hours, and that there were no oaths rendered or testimony tak-

en); and, that the Mexican Judgment was procured by Mr. Greene bribing the Mexican judge. Burke further maintains that Mr. Greene's attempt to domesticate the Mexican Judgment in Colorado was deficient, lacking due process, incomplete, and improperly brought before the Denver District Court under Colorado's Enforcement Act rather than Colorado's Recognition Act.[63]

### A. Validity of Mexican Judgment

■ Mr. Burke alleges that the judge presiding over the Mexican lawsuit was given a cash bribe and later became an attorney for Mr. Greene. This very serious allegation and irregularities in the Settlement Agreement/judgment process are supported, in whole or in part, by two other witnesses, Mr. Mercado and Mr. Watts.[64] Moreover, Greene does not effectively refute this.

In addition to the testimony of Mr. Burke, Mr. Mercado, and Mr. Watts—and the previously identified curiosities and problems with the Settlement Agreement—the circumstances surrounding the entry of the Mexican Judgment raises suspicion and doubt.

First, the Mexican court proceedings were held after regular court hours.[65] Mr. Burke testified that the actual signing of the Settlement Agreement was held in a public area of the courthouse (not in a courtroom or chambers) and close to 5:00 p.m. and that the courthouse closes down there at 1:00 or 3:00 p.m., so the 5:00 p.m. signing was "after hours." [66]

Second, the settlement documents were translated into English only after the

---

63. Mr. Greene's Exhibit 68.

64. It is not unimportant to note that in the absence of credibility and persuasiveness of Mr. Burke and Mr. Greene, the Court did find credible and more persuasive Mr. Chris Watts and Mr. Mercado Hernandez.

65. Transcript, page 85, Burke testimony (July 26, 2006)(Docket # 400).

66. *Id.*

Court event, and the Spanish version was read to Burke by a translator hired by Greene. No English version of the settlement document was present when Burke signed. The substance of the settlement was read to him by Gustavo Polit (an employee of Mr. Greene).[67]

Third, Burke also had no attorney on his behalf present at this signing.[68]

Fourth, there were no oaths rendered, no testimony taken, the Mexican judge was simply asked to witness a settlement between the parties.[69]

In the words of Judge Blackburn in his October 7, 2002 Order, this Bankruptcy Court must determine whether the Mexican Judgment was "so riddled with fraud that it must be set aside."[70] This Court concludes that the Mexican judgment is so flawed and so tainted with procedural and substantive irregularities it cannot stand. The Mexican Judgment and the attendant Settlement Agreement are so questionable as to legitimacy, so suspect as to content, translation and meaning, and so much a product of evident fraud and related misconduct that it cannot be recognized by this Court.

### B. Relevant Colorado Statutes

There are two statutes pertaining to foreign judgments in Colorado. Those statutes are (1) the Uniform Enforcement of Foreign Judgments Act, COLO.REV.STAT. § 13–53–101 *et seq.* (the "Enforcement Act") and (2) the Uniform Foreign Money–Judgments Recognition Act, COLO.REV. STAT. § 13–62–101 *et seq.* (the "Recognition Act").

1. *Uniform Enforcement of Foreign Judgments Act, COLO.REV.STAT. § 13–53–101 et seq. (the "Enforcement Act")*

Under the Enforcement Act a " '[f]oreign judgment' means any judgment, decree, or order of a court of the United States or of any other court, . . . that is entitled to full faith and credit in this state." [71] The Enforcement Act is typically thought of as pertaining to *foreign judgments of sister states.*[72]

To initiate domestication of a foreign judgment in Colorado, the Enforcement Act provides the following:

A copy of any foreign judgment authenticated in accordance with the act of congress or the laws of this state may be filed in the office of the clerk of any court of this state which would have had jurisdiction over the original action had it been commenced first in this state. A judgment so filed has the same effect and is subject to the same procedures, defenses, and proceedings for reopening, vacating, or staying as a judgment of the court of this state in which filed and may be enforced or satisfied in like manner.[73]

The Enforcement Act, at COLO.REV.STAT. § 13–53–104, goes on to provide for the following notice and stay of execution:

67. Transcript, page 83, Burke testimony (July 26, 2006)(Docket # 400).

68. Transcript, page 87, lines 21–25, to page 88, line 1, Burke testimony (July 26, 2006)(Docket # 400). Mr. Burke also testified that Salvene Sausueta represented the Baja Cantina corporation and was present in the courthouse on January 6, 2005, but was not present at the signing of the agreement. Further, Mr. Burke testified that Sausueta did not represent him personally. Transcript,

page 13, lines 5–19, Burke testimony (July 27, 2006)(Docket # 401).

69. Transcript, page 86, Burke testimony (July 26, 2006)(Docket # 400).

70. Docket # 87, at page 10.

71. COLO.REV.STAT. § 13–53–102.

72. *Id.*

73. COLO.REV.STAT. § 13–53–103.

(1) At the time of the filing of the foreign judgment, the judgment creditor or his lawyer shall make and file with the clerk of court an affidavit setting forth the name and last-known post-office address of the judgment debtor and the judgment creditor.

(2) Promptly upon the filing of the foreign judgment and the affidavit, the clerk shall mail notice of the filing of the foreign judgment to the judgment debtor at the address given and shall make a note of the mailing in the docket. The notice shall include the name and post-office address of the judgment creditor and the judgment creditor's lawyer, if any, in this state. In addition, the judgment creditor may mail a notice of the filing of the judgment to the judgment debtor and may file proof of mailing with the clerk. Lack of mailing notice of filing by the clerk shall not affect the enforcement proceedings if proof of mailing by the judgment creditor has been filed.

(3) No execution or other process for enforcement of a foreign judgment filed under this article shall issue until ten days after the date the judgment is filed.

The Enforcement Act, at COLO.REV.STAT. § 13–53–107, also leaves open alternative methods of enforcing a judgment by stating, "The right of a judgment creditor to bring an action to enforce his judgment instead of proceeding under this article remains unimpaired." [74]

### 2. The "Recognition Act"

Under the Recognition Act, a "foreign state" is defined as follows:

[A]ny governmental unit other than the United States, any state, district, commonwealth, territory, insular possession thereof, or the Panama Canal Zone, the Trust Territory of the Pacific Islands, or the Ryukyu Islands, which governmental unit has entered into a reciprocal agreement with the United States recognizing any judgment of a court of record of the United States, or any state, district, commonwealth, territory, insular possession thereof, or the Panama Canal Zone, the Trust Territory of the Pacific Islands, or the Ryukyu Islands, and providing for procedures similar to those contained in this article. C.R.S. § 13–62–102(1).

A "foreign judgment" is defined as "any judgment of a foreign state granting or denying recovery of a sum of money, other than a judgment for taxes, a fine or other penalty, or a judgment for support in matrimonial or family matters." [75]

The Recognition Act, at COLO.REV.STAT. § 13–62–105, also sets forth grounds for nonrecognition, some of which Mr. Burke raised in his Verified Answer in the Denver District Court.[76]

---

74. COLO.REV.STAT. § 13–53–107.

75. COLO.REV.STAT. § 13–62–102(2).

76. COLO.REV.STAT. § 13–62–105, Grounds for nonrecognition (1) A foreign judgment is not conclusive if: (a) The judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law; (b) The foreign court did not have personal jurisdiction over the defendant; or (c) The foreign court did not have jurisdiction over the subject matter. (2) A foreign judgment need not be recognized if: (a) The defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable him to defend; (b) The judgment was obtained by fraud; (c) The claim for relief on which the judgment is based is repugnant to the public policy of this state; (d) The judgment conflicts with another final and conclusive judgment; (e) The proceeding in the foreign court was contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court; or (f) In the case of jurisdiction based only on per-

■ There are a couple of problems with the Recognition Act. First, there are no procedures or time frames set forth in the Recognition Act as to how a movant/petitioner/plaintiff may obtain recognition of a foreign country judgment or how and when a respondent/defendant may raise the grounds for nonrecognition stated in Colo.Rev.Stat. § 13–62–105. Second, as noted above in the definition of "foreign state," for the Recognition Act to come into play, the "foreign state" must have entered into a "reciprocal agreement" with the United States.[77] Mexico, or any other country for that matter, has not entered into such a reciprocal agreement with the United States. However, the Colorado Court of Appeals in *Milhoux v. Linder*, dealing with a Belgium judgment, has pointed out that these issues do not render the Recognition Act meaningless because a Colorado court may also recognize a foreign judgment under the common law principals of comity as set forth in the U.S. Supreme Court case of *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895).[78] The grounds for nonrecognition, or impeachment of a judgment, under the common law principals of comity are similar to those stated in Colorado's Recognition Act at § 13–62–105.[79]

■ Mr. Burke contends that the Denver District Court should not have entered a judgment on Mr. Greene's Verified Petition without having first conducted a hearing or, at least, addressed the issues raised in his timely-filed Verified Answer to Verified Petition. The Court of Appeals in *Milhoux v. Linder* looked to the Enforcement Act for procedures on due process, notice and execution. Relying on the Colorado Supreme Court's case of *Gedeon v. Gedeon*, the Court of Appeals stated, "our supreme court has determined that the due process requirements of the United States Constitution are satisfied by the procedures of the Enforcement Act. This is because the basic requirements of notice and an opportunity for a hearing are satisfied by the foreign court which rendered the original judgment. Hence, pre-judgment notice and hearing requirements do not apply in post-judgment proceedings." [80]

Here, Mr. Burke never did have a hearing; he never did have the issues timely raised in his Verified Answer to Verified Petition considered by the Denver District Court, and those issues included, but were not necessarily limited to, "Grounds for Nonrecognition" found in Colo.Rev.Stat 13–62–101, the Recognition Act. The Denver District Court never held its scheduled hearing on these issues due to filing of the bankruptcy case. Mr. Burke's right to due process of law was not satisfied.

The trial on the claim objection in this Bankruptcy Court, conducted July 26–28, 2006, August 15, 2006 and December 8, 2006, was essentially the due process hearing that Mr. Burke did not get in Denver District Court.

---

sonal service, the foreign court was a seriously inconvenient forum for the trial of the action.

77. *Milhoux v. Linder,* 902 P.2d 856, 859–860 (Colo.App.1995) ("the unambiguous language of the Recognition Act requires a reciprocity agreement before a foreign judgment will be recognized and that this requirement does not necessarily render the Act meaningless.")

78. *Milhoux v. Linder,* 902 P.2d 856, 860 (Colo.App.1995) ("a foreign judgment may

also be recognized under the common law doctrine of comity.")

79. *See Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895).

80. *Milhoux v. Linder,* 902 P.2d 856, 862 (Colo.App.1995) and *Gedeon v. Gedeon,* 630 P.2d 579 (Colo.1981), appeal dismissed, 454 U.S. 1050, 102 S.Ct. 592, 70 L.Ed.2d 585 (1981)

The Court concludes, consistent with the Recognition Act, that the entry of the Colorado Judgment was not proper, not procedurally correct, and not in full compliance with principles of due process of law.

## IV. CONCLUSION

Mindful of the very disparate versions of events, communications and history between the parties, and recognizing the difficulties of reconstructing a cogent and reliable recital of activities and conduct—which occurred, in principal part, about 15 years ago in a foreign country with complications resulting from language translation, a lack of credibility of the principal disputants, exacerbated by bitter personal enmity and distrust—the Court finds and concludes that:

(A) an I.O.U. obligation was established and proven by a preponderance of the evidence to be due and owing by the Baja Cantina restaurant (and related business activities), known as Baja Cantina, S.A. de C.V., but that obligation has not been proven, as such, to be that of this Debtor, Mr. Burke,

(B) the Settlement Agreement and attendant Mexican judgment are so deficient—or to use Judge Blackburn's term, "riddled"—with questionable features, irregular court proceedings, disputed legitimacy and contested translations, an absence of due process and, yes, evident fraud, that the Court cannot conclude that they are valid, legitimate or that they should not be set aside, and

(C) the Colorado judgment, as well, is deficient and unenforceable; the

process invoked by Mr. Greene and applicable statutes—coupled with notions and principles of due process—did not accord Mr. Burke his day in court and the process was not completed and concluded in a legally sufficient manner. The Colorado Judgment is not enforceable.[81]

IT IS THEREFORE ORDERED that the Debtor's objection to Richard Greene's proof of claim for $1,394,142.00 filed on February 12, 1999 in the main bankruptcy case, 98–25466–MER (Claim No. 7), is sustained and the subject claim is disallowed.

---

**81.** This is not to say that Mr. Greene or the other investors had no claim whatsoever against Mr. Burke. They may have or may have had a claim, be it a contract claim or other claim for negligence or mismanagement of the business. But, those claims have never been raised in this Court. The Plaintiff has pursued his claim only, exclusively, on the I.O.U., and the Mexican and District Court judgments.